**Carey Dean MOORE, Petitioner,**

v.

**Michael L. KINNEY, Respondent.**

**No. 4:99CV3263.**

United States District Court,
D. Nebraska.

Nov. 14, 2000.

**1024**

Alan E. Peterson, Cline, Williams Law Firm, Lincoln, NE, Daniel E. Klaus, Rembolt, Ludtke Law Firm, Lincoln, NE, for Petitioner.

Donald B. Stenberg, J. Kirk Brown, Attorney General's Office, Lincoln, NE, for Respondent.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 49) and the objections to the Report and Recommendation filed by Respondent (filing 50) and Petitioner (filing 51), as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4. After a de novo review of the portions of the Recommendation to which objections have been made, I find that the Magistrate Judge's Recommendation that the Petition for Writ of Habeas Corpus (filing 1) be granted with respect to claims (1) and (2) should be rejected for the reasons stated below.

I also find, without extended discussion, that I should adopt the Magistrate Judge's Recommendation that claims (3) through (12) be denied for essentially the same reasons stated by the Magistrate Judge.

While I might employ a slightly different analysis than that performed by the Magistrate Judge on some of the issues presented in claims (3) through (12), I have no material disagreement with the Magistrate Judge's ultimate disposition of those claims. In his objections to the Magistrate Judge's Report and Recommendation, Petitioner also asserts what is in reality an appeal from the Magistrate's order denying Petitioner's request for an evidentiary hearing and the Magistrate's unstated, but implicit, denial of Petitioner's request for expansion of the record. (Filing 51, at 2.) I shall deny Petitioner's appeal because the Magistrate Judge's orders were not "clearly erroneous or contrary to law." NELR 72.3.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During a four-day span in August 1979, Petitioner Carey Dean Moore robbed and murdered two Omaha taxi drivers. The relevant events surrounding the murders have been described by the Nebraska Supreme Court:

> About August 20, 1979, [Moore] purchased the handgun with which the murders were committed. He acquired the gun by purchasing it from a cabdriver who had pawned the gun. [Moore] and the seller went together to the pawnshop where the gun was redeemed, [Moore] furnishing the money for the redemption and paying the seller an additional $50. The gun was then test-fired.

> We now quote from the findings made by the sentencing panel in its order, which findings are fully supported by uncontroverted evidence: "[Moore's] own statements, in his confession to Officers O'Donnell and Thompson while in custody at Charles City, Iowa, indicate that these crimes had been in the planning stage for at least a day or two before the [Reuel Eugene] Van Ness[, Jr.,] homicide. Apparently on the evening prior to the Van Ness murder,

[Moore] had called a number of cabs from a telephone booth somewhere on Farnam Street in the downtown Omaha area to see how quickly each would respond to his call. [Moore] then hid somewhere in the vicinity to await each cab's arrival, at which time he checked the cab to determine whether the driver would be a suitable victim, *i.e.*, not too young, since [Moore] stated that it was easier for him to shoot an older man rather than a younger man nearer his own age. On the evening of the Van Ness homicide, [Moore's] plan was to call one cab at a time from the Smoke Pit restaurant, and, if the driver who responded 'wasn't too old,' [Moore] would just not identify himself as the fare for which the cab had been summoned. When ... Van Ness arrived at the Smoke Pit on August 22, 1979, [Moore] determined that this was the driver who would be robbed and shot because 'he wasn't too young'.

"A similar pattern of events unfolded on August 26, 1979. [Moore] went to the Greyhound Bus depot at 18th and Farnam Streets in Omaha that evening, and, when he saw a lone cab with an older driver [Maynard D. Helgeland] parked at the taxi stand outside the depot, he got into the cab and directed the driver to take him to the Benson area. According to [Moore], this particular cab and driver were selected both because there were no other cabs at the taxi stand at the time, thus decreasing the chances of [Moore's] being identified, and because the driver was an older man. [Moore] then stated that, as previously discussed, he had planned ahead of time to rob and shoot the driver of whichever cab he selected." In his confessions [Moore] stated that he killed each of the victims in order that the victim would not be able to identify him as the robber.

*State v. Moore,* 250 Neb. 805, 806–08, 553 N.W.2d 120, 125–26 (1996) (quoting Nebraska Supreme Court's opinion of Jan. 29, 1982, affirming on direct appeal original sentences of death imposed upon Moore by sentencing panel of the district court on June 20, 1980, *State v. Moore,* 210 Neb. 457, 461–62, 316 N.W.2d 33, 36–37, *cert. denied,* 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982)), *cert. denied,* 520 U.S. 1176, 117 S.Ct. 1448, 137 L.Ed.2d 554 (1997).

Moore was convicted of two counts of first-degree murder, based on a felony murder theory, and was sentenced to death by a three-judge panel in 1980.[1] The Nebraska Supreme Court affirmed the convictions and sentence in *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33, *cert. denied,* 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982). Moore filed a motion for postconviction relief in 1982, which was denied by the district court in 1983, and which denial was affirmed by the Nebraska Supreme Court in *State v. Moore,* 217 Neb. 609, 350 N.W.2d 14 (1984).

Moore then filed a petition for writ of habeas corpus in the United States District Court for the District of Nebraska, which granted the writ in *Moore v. Clarke,* No. CV84–L–754 (D.Neb. Sept. 20, 1988), holding unconstitutionally vague the "exceptional depravity" component of the aggravating circumstance provided in Neb. Rev.Stat. § 29–2523(1)(d)—that is, that the "murder was especially heinous, atrocious, cruel, or *manifested exceptional depravity by ordinary standards of morality and intelligence*" (emphasis added)[2]—and ordering the reduction of Moore's sentence to life imprisonment unless the State initiated capital resentencing proceedings

---

1. The procedural history of this case is set forth in *State v. Moore,* 250 Neb. 805, 808–09, 553 N.W.2d 120, 126 (1996), *cert. denied,* 520 U.S. 1176, 117 S.Ct. 1448, 137 L.Ed.2d 554 (1997), and *State v. Moore,* 256 Neb. 553, 554–55, 591 N.W.2d 86, 89, *cert. denied,* —— U.S. ——, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999).

2. The statutory language at issue before this court remains the same today. *See* Neb.Rev. Stat. Ann. § 29–2523(1)(d) (Lexis Supp.1999).

within 60 days after the judgment became final. The State of Nebraska then appealed to the Eighth Circuit Court of Appeals, which affirmed the grant of habeas corpus relief and order of resentencing, holding unconstitutionally vague, both on its face and as interpreted by the Nebraska Supreme Court, the "exceptional depravity" component of the aggravating circumstances provided in Neb.Rev.Stat. § 29–2523(1)(d). *Moore v. Clarke,* 904 F.2d 1226 (8th Cir.1990). The Eighth Circuit's affirmance of the grant of habeas corpus relief and order of resentencing was reaffirmed by the Eighth Circuit on denial of rehearing. *Moore v. Clarke,* 951 F.2d 895 (8th Cir.1991), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992).

On remand, the Nebraska Supreme Court determined that it would decline to resentence Moore itself, but instead would remand the matter to the state district court for resentencing. *State v. Moore,* 243 Neb. 679, 502 N.W.2d 227 (1993). The three-judge sentencing panel of the state district court again sentenced Moore to death, a decision affirmed by the Nebraska Supreme Court in *State v. Moore,* 250 Neb. 805, 553 N.W.2d 120 (1996), *cert. denied,* 520 U.S. 1176, 117 S.Ct. 1448, 137 L.Ed.2d 554 (1997).

After the Nebraska Supreme Court set an execution date for May 9, 1997, Moore filed a state action for postconviction relief on April 30, 1997. On May 5, 1997, the Nebraska Supreme Court stayed Moore's execution and the district court denied Moore's motion for postconviction relief without an evidentiary hearing. The Nebraska Supreme Court affirmed the judgment of the district court in *State v. Moore,* 256 Neb. 553, 591 N.W.2d 86, *cert. denied,* 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999). On October 5, 1999, Moore filed in this court the petition for writ of habeas corpus now under consideration.

## II. ANALYSIS

The Magistrate Judge concludes that Moore's Petition for Writ of Habeas Corpus should be granted because: (1) the narrowing construction of "exceptional depravity" used by the sentencing panel and adopted by the Nebraska Supreme Court is insufficient; and (2) even if the narrowing construction was appropriate, Moore was denied procedural due process because the sentencing panel announced the construction at the same time it pronounced sentence and, therefore, the panel failed to give Moore proper notice.

### A. Narrowing "Exceptional Depravity" Over Time

In order to understand what follows, a timeline regarding the narrowing of "exceptional depravity" is helpful. I provide that chronology next.

#### 1982

In 1982, the Nebraska Supreme Court first dealt with and affirmed the death sentence for the petitioner. *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982). In that case, the court made it clear that the facts of the case, including the fact that the murders were "coldly planned" and the defendant selected victims because of their age, warranted the conclusion that the murders were "exceptionally depraved." *Id.* at 471, 316 N.W.2d at 41.

#### 1986

Four years later, the Nebraska Supreme Court adopted a five-part narrowing test for "exceptional depravity," and that test was derived from the Arizona case of *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). *See State v. Palmer,* 224 Neb. 282, 318–20, 399 N.W.2d 706, 731–32 (1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). The factors which tended to narrow "exceptional depravity" included: (1) the apparent relishing of the murder by the killer; (2) the infliction of gratuitous violence on the victim; (3) the needless mutilation of the victim; (4) the senselessness of the crime; and (5) the helplessness of the victim. The court did not state that its five-part test

was the only limiting construction of "exceptional depravity."

On the same day that the *Palmer* opinion was announced, the Nebraska Supreme Court announced *State v. Joubert,* 224 Neb. 411, 399 N.W.2d 237 (1986). There, the court recognized that it adopted the *Palmer* factors and it applied them. *Id.* at 431–32, 399 N.W.2d at 251.

But the *Joubert* court was not finished. After discussing and applying the *Palmer* factors, and citing its 1982 decision in *Moore,* the court also suggested another factor: "Additionally, the murders were coldly planned as part of a repetitive program of self-gratification, involving immature victims selected on the basis of their availability at a time when the likelihood of detection was slight. *See State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982)." *Joubert,* 224 Neb. at 432, 399 N.W.2d at 251.

### 1988

Judge Urbom, adopting the Report and Recommendation of Magistrate Judge Piester, found that Moore's death sentence must be set aside because "exceptional depravity" was vague and unlimited. *See Moore v. Grammer,* CV84–L–754 (May 23, 1988) (Filing 41, Report & Recommendation, at 40–43; Filing 44, Memorandum of Decision). Neither Judge Piester nor Judge Urbom referred to the *Joubert* decision in the context of their discussions regarding the "exceptional depravity" aggravating circumstance.

Judge Urbom seemed to discredit two *Palmer* factors; that is, the "senselessness of the crime" and "helplessness" of the victim. (Memorandum of Decision, at unnumbered p. 4.) The Judge also stated: "If the 1986 definition intended to abandon its pre–1986 efforts at guidance, it did not say so distinctly. If it did not so intend, a sentencer now has a series of suggestions, some objective and some not, from which to choose, without assurance that the series is complete." *Id.*

### May 25, 1990

On May 25, 1990, the Eighth Circuit Court of Appeals affirmed Judge Urbom's decision that "exceptional depravity" as stated in the statute was too vague. *Moore v. Clarke,* 904 F.2d 1226, 1233 (8th Cir.1990). In so doing, the court found that the "sentencing panel did not have the benefit of Palmer's 'clarification'; therefore, the State should not be permitted to rely on it now." *Id.* at 1231. Nevertheless, the court went on to find that: "Assuming arguendo that *Palmer* had been available to guide the panel sentencing Moore, we still are not convinced that the *Palmer* decision, when considered with earlier cited cases, fulfills the constitutional obligation of the Nebraska Supreme Court." *Id.*

### June 27, 1990

On the same day, in the summer of 1990, the Supreme Court decided *Walton v. Arizona,* 497 U.S. 639, 654–55, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and *Lewis v. Jeffers,* 497 U.S. 764, 777, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). These cases approved the *Gretzler* limiting construction. In fact, the Eighth Circuit later said that the "*Walton* decision established [the] validity of [the] entire 5–factor *Gretzler* test." *Joubert v. Hopkins,* 75 F.3d 1232, 1244 n. 8 (8th Cir.), *cert. denied,* 518 U.S. 1029, 116 S.Ct. 2574, 135 L.Ed.2d 1090 (1996).

### 1991

As a result of the *Walton* and *Jeffers* cases, the State of Nebraska filed a petition for rehearing with the Eighth Circuit. After considering the petition for nearly 16 months, the Eighth Circuit denied it. *Moore v. Clarke,* 951 F.2d 895 (8th Cir. 1991). In that decision, the Court of Appeals appeared to shrink from its earlier criticism of the *Gretzler* and *Palmer* factors. In fact, the court stated, "the changes found desirable by the Nebraska Supreme Court in *Palmer* then demonstrate that the standards applied to Moore were vague." *Id.* at 897. Therefore, "since the Nebraska Supreme Court did not adopt *Gretzler*-like language until six years after Moore's sentencing[,]" the *Walton* and *Jeffers* opinions did not re-

quire a rehearing in the *Moore* matter. *Id.*

### 1993

Without attempting to reweigh or more narrowly define "exceptional depravity," the Nebraska Supreme Court remanded Moore's case to the sentencing panel. *State v. Moore,* 243 Neb. 679, 502 N.W.2d 227 (1993). The Nebraska Supreme Court did so because "absent a U.S. Supreme Court decision as to the propriety of appellate court reweighing, it would be a waste of judicial resources for this court to render an opinion which will subsequently be overturned on a writ of habeas corpus by the federal courts." *Id.* at 683, 502 N.W.2d 227.

### 1994

On October 11, 1994, in an unpublished opinion, Judge William G. Cambridge of this court granted the writ in *Joubert v. Hopkins,* No. 8:CV91–00350 (D.Neb. Oct. 11, 1994) (Filings 52 & 53). "The district court granted relief on the claim that 'exceptional depravity' is an unconstitutionally vague aggravating circumstance, and denied relief on Joubert's other claims." *Joubert v. Hopkins,* 75 F.3d at 1240. The district court determined that the term was vague as that term was used at Joubert's sentencing. *Id.* at 1244.

### 1995

Believing that it had "no effective appellate definition," the Moore resentencing panel stated that it had "a duty and obligation in the first instance to redefine appropriate constitutional limiting conditions for this aggravating circumstance." *State v. Moore,* Order of Sentence, Docket 106, Page 55, at 12 (Apr. 21, 1995) (hereinafter *"Moore,* Sentencing Panel Opinion"). The sentencing panel then proceeded to narrow "exceptional depravity." According to the panel, those words mean the killer engaged in "cold, calculated planning of the victim's death, as exemplified by ... the purposeful selection of a particular victim on the basis of specific characteristics such as race, gender, creed, sexual orientation, disability, or age." *Moore,* Sentencing Panel Opinion, at 14. The panel also

made clear that those words "require more than merely the premeditation necessary to support a conviction of first-degree murder." *Id.* at 15.

### January 25, 1996

In January of 1996, the Eighth Circuit Court of Appeals observed that the Nebraska Supreme Court had narrowed "exceptional depravity" in *Joubert* and *Palmer. Joubert v. Hopkins,* 75 F.3d at 1244 & n. 8 ("[W]e note that the Nebraska Supreme Court did apply a narrower definition of 'exceptional depravity'.... *See Joubert,* 399 N.W.2d at 251."; "The Nebraska Supreme Court adopted the *Gretzler* test as its own when narrowing 'exceptional depravity' in *State v. Palmer* ....").

In addition, the Court of Appeals stated: "That narrowed definition is clearly constitutional. *Walton v. Arizona,* 497 U.S. 639, 654–55, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)." *Id.* In support of this proposition, the *Joubert* court also cited its 1991 decision denying the petition for rehearing in *Moore v. Clarke,* where the court appeared to shrink from its prior criticism of the *Palmer* factors. *Id.*

Nevertheless, the court decided not to reach the merits of the issue because it was interwoven with the question of whether the Nebraska Supreme Court could reweigh by using the limiting construction and those issues had not been properly briefed. *Id.* at 1245. Rather, the Eighth Circuit reversed because "any error as to the application of the 'exceptionally depraved' prong was harmless beyond a reasonable doubt." *Id.* It, therefore, did not decide the question of whether the "clearly constitutional" limiting construction imposed on appeal cured the application of the unlimited and vague statutory language used by the *Joubert* sentencing body.

### November 22, 1996

On appeal from the second death sentence in Moore's case, the Nebraska Supreme Court, in an very thorough opinion, observed that the *Walton, Jeffers,* 1991

*Moore,* and 1996 *Joubert* decisions clearly established that the *Palmer* factors were constitutional and the sentencing panel could have applied them. *State v. Moore,* 250 Neb. 805, 817–18, 553 N.W.2d 120, 131 (1996). However, the court recognized that because the 1996 *Joubert* decision had not been handed down at the time resentencing took place in 1995, the "confusing state of precedent" justified the sentencing panel in applying a narrowing construction crafted by that body. *Id.* at 818–819, 553 N.W.2d at 131–32.

The Nebraska Supreme Court found that the narrowing construction used by the sentencing panel was correct. *Id.* at 819–21, 553 N.W.2d at 132–33. In particular, the court found the sentencing panel's definition to be "sound and [we] hereby adopt it." *Id.* at 821, 553 N.W.2d at 133. The court added that one or more of the *Palmer* factors *or* the sentencing panel's narrowing construction, if proved, would support a finding of "exceptional depravity." *Id.*

· The court went on to hold that Moore was not denied due process because the sentencing panel announced the limiting construction when it sentenced Moore. It specifically found that "a person of ordinary intelligence in Moore's situation" would have been able to foresee the narrowing construction because of (1) the language of the statute itself; (2) the pre-*Palmer* case law; (3) the *Palmer* decision; (4) the 1986 *Joubert* decision that exceptional depravity was shown by planning and age selection; (5) the 1982 holding in *Moore* that the victims were selected because of age; and (6) the Supreme Court's decisions in *Walton* and *Jeffers.* *Id.* at 824–25, 553 N.W.2d at 134–35.

### 1999

After an unsuccessful postconviction attack in the state district court, Moore appealed to the Nebraska Supreme Court. *State v. Moore,* 256 Neb. 553, 591 N.W.2d 86 (1999). An important issue on appeal was whether Moore's counsel was ineffective at resentencing for failing to anticipate

the sentencing panel's narrowing construction of "exceptional depravity."

In an another exhaustive opinion, this time authored by Justice Gerrard, the Nebraska Supreme Court rejected Moore's ineffective assistance of counsel claim regarding his lawyer's alleged malpractice in failing to anticipate and deflect application of the limiting construction. *Id.* at 559–63, 591 N.W.2d at 91–93. The court observed that since 1982, "every sentencing panel and reviewing court has cited Moore's cold, calculated planning of the victims' deaths and, in particular, selection of the victims based on particular characteristics as *the* integral part of the exceptional depravity prong." *Id.* at 560, 591 N.W.2d at 92 (emphasis in original). The court stressed that it was Moore's own confessions that showed that the murder had been planned for days and that Moore intentionally selected older men. *Id.* at 560–61, 591 N.W.2d at 92. The court emphasized that Moore failed to present any evidence or argument explaining how he would "rebut his own confession or the narrowed definition of exceptional depravity utilized by the sentencing panel." *Id.* at 561–62, 591 N.W.2d at 92.

### B. This Case Does Not Involve Application of the *Palmer* Factors

The Magistrate Judge discusses in detail why the *Palmer* (*Gretzler*) factors, and particularly the "senselessness" of the crime or the "helplessness" of the victim parts of that analysis, are vague. (Filing 49, Report & Recommendation, at 15–17.) However, the sentencing panel did not rely upon those factors except to observe that the Nebraska Supreme Court had promulgated them after Moore's first sentencing and the Eighth Circuit in *Moore v. Clarke* could not ascertain whether the *Palmer* factors were intended to replace or merely clarify the past construction of "exceptionally depraved." *Moore,* Sentencing Panel Opinion, at 11–12.

In contrast, the panel, deriving a definition from prior cases, said "exceptional depravity" exists where the proof demon-

strates "the killer's cold, calculated planning of the victim's death, as exemplified by ... the purposeful selection of a particular victim on the basis of specific characteristics such as race, gender, creed, sexual orientation, disability, or age." *Id.* at 14. The sentencing panel stressed that this definition required "more than merely the premeditation necessary to support a conviction of first-degree murder." *Id.* at 15.

The Nebraska Supreme Court said that the panel's construction was a correct reading of their prior cases. *State v. Moore,* 250 Neb. 805, 821 & 824–26, 553 N.W.2d 120, 133–35 (1996). The Nebraska Supreme Court also found that the evidence supported the finding that "exceptional depravity" thus defined in fact existed. *Id.* at 838, 553 N.W.2d at 141.

Consequently, the focus should be on whether "exceptional depravity," as defined by the sentencing panel and later affirmed and adopted by the Nebraska Supreme Court, is constitutionally sufficient. Since they were not applied to Moore, the proper concern is not whether the *Palmer* factors are correct in the abstract.

### C. The Sentencing Panel Did Not Pick The Construction to Fit the Facts

Citing *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (even though the facts of the case might fall within a proper understanding of an otherwise vague aggravating circumstance, a jury instruction expressed in the words of the statute, without a limiting construction, failed to give the jury as a sentencing body sufficient direction), the Magistrate Judge states that the sentencing panel "created this 'selection of the victim' supprong [sic] based strictly on the facts of this case" and the writ must be granted as a result. (Filing 49, Report & Recommendation, at 22.) Respectfully, the Magistrate Judge is wrong.

■ Initially, the Supreme Court has explicitly stated that "the logic of ... cases [such as *Maynard* ] has no place in

the context of sentencing by a trial judge." *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). This is because "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Id.* Therefore, the sentencing panel did not violate Moore's federal rights when it discerned a proper limiting construction from the precedents and then proceeded to decide whether the facts fit that limiting construction. On the contrary, the sentencing panel, comprised of three experienced trial judges, did exactly what one would expect of judges who sit both as fact finders and judges of the law. That is, they stated the law, and applied the law thus stated to the facts. Simply put, because it involved a jury sentencing issue and not a judge sentencing issue, the "logic of" *Maynard* "has no place" here. *Id.*

Furthermore, despite the Magistrate Judge's contrary finding, the sentencing panel did not select a limiting construction to fit the facts of the case. In fact, the sentencing panel stated that it intended to ascertain the proper "limiting construction of 'exceptional depravity' and *then* apply that construction to the facts of the case[ ] now pending before us." *Moore,* Sentencing Panel Opinion, at 12 (emphasis added). The record establishes that the panel first extensively reviewed in writing the federal and state case law on "exceptional depravity." *Moore,* Sentencing Panel Opinion, at 11–15. In the course of doing so, the panel set forth its understanding of a proper limiting construction. *Id.* After that, it decided whether Moore's conduct came within that narrowed definition. *Id.* at 15–16. Consequently, I respectfully reject, as factually unsupported, the Report and Recommendation's statement that the panel selected a limiting construction "strictly on the facts of this case."

### D. The Definition Actually Used by the Sentencing Panel and the Nebraska Supreme Court Passes Federal Constitutional Scrutiny

■ The narrowed definition discerned by the sentencing panel, applied to the

facts of this case by that panel, and approved by the Nebraska Supreme Court is not unconstitutional whether viewed facially or as applied to Moore. To be specific, the following narrowed definition of the words "manifested exceptional depravity by ordinary standards of morality and intelligence" is sufficiently precise to withstand federal constitutional scrutiny, to wit:

1. Those words mean the killer engaged in "cold, calculated planning of the victim's death, as exemplified by ... the purposeful selection of a particular victim on the basis of specific characteristics such as race, gender, creed, sexual orientation, disability, or age." *Moore,* Sentencing Panel Opinion, at 14.

2. Those words "require more than merely the premeditation necessary to support a conviction of first-degree murder." *Id.* at 15.

As the Supreme Court has explained, "the aggravating circumstance must meet two requirements." *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (holding, among other things, that California's special circumstance statute, requiring the sentencing body to consider the defendant's age at the time of the crime, was not unconstitutionally vague). "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Id.* (citing *Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)). I turn then to that first factor.

Giving a fair reading to the definition used by the sentencing panel and approved by the Nebraska Supreme Court, the words exclude most defendants convicted of capital murder. Essentially, the words require two elements, both of which are constricted. The initial qualification requires planning the victim's death beyond normal premeditation. The planning must be "cold," that is to say, "calculated." Next, the planning must involve a purposeful sorting process to select victims. The

planning must focus upon individuals who have historically been subjected to discrimination or who otherwise possess some immutable characteristic that the victim cannot change. For example, the murderer must plan to select victims because of their age. Taken together, these elements plainly limit the number of Nebraska murderers who may be sentenced to death.

"Second, the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630 (citing *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) & *Arave,* 507 U.S. at 471, 113 S.Ct. 1534 (quoting *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990))). For the following reasons, I decide that the narrowing definition of "exceptionally depraved" at issue in this case is not vague.

The narrowing of the words "exceptional depravity" does not require "mathematical precision." *Walton v. Arizona,* 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) ("[T]he proper degree of definition of an aggravating factor of this nature is not susceptible of mathematical precision.... [We cannot] fault the state court's statement that a crime is committed in an especially 'depraved' manner when the perpetrator 'relishes the murder, evidencing debasement or perversion,' or 'shows an indifference to the suffering of the victim and evidences a sense of pleasure' in the killing." (citation omitted)); *Lewis v. Jeffers,* 497 U.S. 764, 777, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (stating that "[o]ur holding in *Walton* ... bears repeating here" and reciting the above-quoted language in *Walton* ). *See also Arave v. Creech,* 507 U.S. 463, 473–74, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) (a limiting construction of "utter disregard for human life," meaning a "cold-blooded, pitiless slayer," passed constitutional muster "even though 'the proper degree of definition of an aggravating factor of this nature is not susceptible of mathematical precision' ") (quoting *Walton* ); *Proffitt v. Flor-*

*ida,* 428 U.S. 242, 255 & 260, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (White, J., concurring in judgment) (approving Florida statutory aggravating circumstance that, "although ... not susceptible of mechanical application ..." was "by no means so vague and overbroad as to leave the discretion of the sentencing authority unfettered"; "especially heinous, atrocious, or cruel" meant a "conscienceless or pitiless crime which is unnecessarily torturous to the victim").

Moreover, this "vagueness review is quite deferential." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. 2630. An aggravating "factor is not unconstitutional if it has some 'common-sense core of meaning....'" *Id.* (quoting *Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (White, J., concurring in the judgment)). In the end, the "States may adopt capital sentencing processes that rely upon" the sentencing bodies "to exercise wide discretion" and this deference "is evident from the numerous factors [the Supreme Court has] upheld against vagueness challenges." *Id.* at 974, 114 S.Ct. 2630.

As a result, a proper vagueness analysis must recognize that limiting words like "relishes the murder" or "cold-blooded, pitiless slayer" or which reference "age" have been approved by the Supreme Court and are proper analogies against which we can judge the definition in this case. Additionally, I must use a method of review that: (1) does not require the limiting words to posses "mathematical precision"; (2) appreciates that limiting words are "not susceptible of mechanical application"; (3) is "quite deferential"; (4) looks to whether the limiting words have a "common-sense core of meaning"; and (5) permits the sentencing body "to exercise wide discretion."

When I take the definition of "exceptional depravity" used in this case and apply it against other definitions that have been approved by the Supreme Court and when I apply the standard of review used by the Supreme Court to review the limiting descriptions, the Nebraska words are far more precise than other constructions that have been approved. They require (1) cold, calculated planning and (2) the selection of victims based upon (a) characteristics that have been used as a basis for discrimination or (b) a physical characteristic that the victim cannot change. The words are not "vague" as that term is understood by the Supreme Court.

The Magistrate Judge thought the definition was improper because "selecting the victim, however, need have nothing to do with the grizzly deeds of the murder itself." (Filing 49, Report & Recommendation, at 20.) But I fail to understand why, if this is so, that failing is a federal constitutional problem. The United States Supreme Court has never limited aggravating circumstances generally, or "exceptional depravity" in particular, to "grizzly deeds." *See, e.g., Walton,* 497 U.S. at 654–55, 110 S.Ct. 3047 (approving limiting construction of "especially depraved" which turned on, among other things, whether the perpetrator "relishes the murder"). *See also Tuilaepa,* 512 U.S. at 974, 114 S.Ct. 2630 (describing "the numerous factors [the Supreme Court has] upheld against vagueness challenges"; denying vagueness challenge to statute requiring sentencer to consider defendant's age at time of crime). So long as the definition channels the discretion of the sentencing body and it is not vague, the state courts are free to limit "exceptional depravity" in any way they choose without violating the Eighth Amendment.

The Magistrate Judge also thought the phrase "such as" followed by descriptive words like "race" or "age" was improperly "open ended." (Filing 49, Report & Recommendation, at 21.) To illustrate his point, the Judge asked questions like the following: "[W]hat about a killer targeting prostitutes?"; "Or persons with tattoos (or other visible, permanent, non-disabling characteristics, such as moles, color of eyes, hair, etc.)?"; or "What if the killer targeted for 'mercy killing' only persons

who have some terminal, degenerative disease that has not yet 'disabled' them?" (Filing 49, Report & Recommendation, at 21–22 n. 10.)

Those questions, and the analysis that underlie them, seek to impose a requirement of impossible precision. The Supreme Court has never used such a standard. On the contrary, the Supreme Court has stressed that an aggravating circumstance is valid and not vague if the definition has a "common-sense core of meaning." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. 2630. The limiting construction used by the sentencing panel, and approved by the Nebraska Supreme Court, meets that test.

### E. The Method Used to Arrive at the Limiting Construction Did Not Deprive the Defendant of Due Process

■ Despite the fact that "neither the Supreme Court nor the lower courts have addressed a similar type of challenge," the Magistrate Judge concluded that the method by which the sentencing panel arrived at the limiting construction denied the defendant procedural due process. (Filing 49, Report & Recommendation, at 23 & 25.) Essentially, the alleged fault is this: the panel announced the limiting construction when it pronounced the sentence and not before. I reject this claim because the limiting construction was both legally and factually foreseeable to the defendant and his counsel.[3] That is, neither the defendant nor his counsel should have been, nor were they, surprised.

I agree with the Nebraska Supreme Court's extensive analysis of the due process issue in its 1999 and 1996 opinions. *Moore,* 256 Neb. at 559–63, 591 N.W.2d at 91–93; *Moore,* 250 Neb. at 821–26, 553 N.W.2d at 133–36. I highlight only a few

of the more salient reasons why Moore was not denied due process when the sentencing panel carefully limited the meaning of "exceptional depravity."

To begin with, the Supreme Court has held that a statute, as construed, " 'may be applied to conduct occurring prior to the construction, provided such application affords fair warning to the defendan[t].' " *Osborne v. Ohio,* 495 U.S. 103, 115, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 491 n. 7, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (citations omitted)). Moore clearly had ample warning.

Since at least 1986, it had been the law in Nebraska that a limited definition of "exceptional depravity" included a killer planning to kill someone in a calculated manner and selecting the victims based upon their age. In *State v. Joubert,* 224 Neb. 411, 430, 399 N.W.2d 237, 250 (1986), the Nebraska Supreme Court was confronted with a murderer who killed two boys, one a 12–year old and the other a 13–year old, after having "planned these abductions and murders far in advance." There the court held that, in addition to the *Palmer* factors, the murders were "exceptionally depraved" where "the murders were coldly planned ... involving immature victims selected" and an "intellectual approach." *Id.* at 432, 399 N.W.2d at 251. In support of that proposition, the Nebraska Supreme Court cited *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982)—a case which involved the very defendant who filed the habeas petition now before this court. *Id.* I, therefore, conclude that no reasonable person could have been surprised by the sentencing panel's 1995 an-

---

**3.** Although acknowledging that the case is not directly on point, the Magistrate Judge relies on *Coleman v. McCormick,* 874 F.2d 1280 (9th Cir.) (en banc), *cert. denied,* 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989), to support his conclusion that Moore's resentencing panel violated Moore's right to due process when it "reformulated" the "exceptional depravity" aggravating factor found in Neb.Rev.Stat.

Ann. § 29–2523(1)(d) and applied such reformulation to Moore's case without advance notice to Moore. I find that *Coleman* is inapposite for a variety of reasons, not the least of which is the completely distinguishable factual and legal scenario involved in that case. Unlike *Coleman,* Moore's case does not involve the retroactive application of a new death penalty sentencing statute.

nouncement of a limiting construction that had been apparent since at least 1986.

I am aware that at the time the sentencing panel issued its opinion in this case, Judge Cambridge of this court had concluded that Joubert would escape the death penalty because " 'exceptional depravity' is an unconstitutionally vague aggravating circumstance." *Joubert v. Hopkins,* 75 F.3d 1232, 1240 (8th Cir.1996) (reversing the decision of the district court). Noting in dicta that the Nebraska Supreme Court in *Joubert* had limited "exceptional depravity" on appeal and "[t]hat narrowed definition is clearly constitutional," the Eighth Circuit reversed because "any error as to the application of the 'exceptionally depraved' prong was harmless beyond a reasonable doubt." *Id.* at 1245. Because the Circuit's opinion in *Joubert* was not released until after Moore was resentenced, the sentencing panel did not have the benefit of that opinion.

Judge Cambridge's opinion in *Joubert* gave Moore no reason to believe that a limiting construction based upon planning and age was unlikely or inappropriate. On the contrary, his opinion made it virtually certain that a limiting construction similar to the one adopted by the Nebraska Supreme Court in the *Joubert* appeal would be applied by later sentencing panels precisely because Judge Cambridge had ruled that the statutory language itself, without a limiting construction, was vague. Therefore, Judge Cambridge's opinion in *Joubert* does not present a valid basis for Moore to claim that he was surprised. On the contrary, it provided him with a strong reason to believe that a *Joubert*-like limiting construction would be forthcoming.

Still further, the record in this case establishes that defense counsel was not in fact surprised. It is obvious that Moore and his counsel knew that the resentencing hearing would involve "exceptional depravity" and what the term meant. After all, that is explicitly why the Eighth Circuit Court of Appeals reversed and remanded for resentencing.

In April of 1994, after the remand, and in advance of the evidentiary hearing, the sentencing panel ordered the State of Nebraska to disclose its witnesses. (Filing 18 [4], Transcript, Vol. 1 (hereinafter "Tr. 1") at 41–42 & 62; R–I, 00141). There is no claim that the State of Nebraska failed to do so. The evidentiary hearing began on June 29, 1994. It concluded on June 30, 1994. The State called only two witnesses at the evidentiary hearing. The State of Nebraska called the police officer who had taken Moore's confessions and a pathologist. (Filing 18, Tr. 1 at 100 & 134.)

In June of 1994, during opening statements, it was clear that both parties knew that a proper limiting construction would be the central focus of the "exceptional depravity" debate. The prosecutor stated:

We are all aware of why we're here. . . .

And the reason for the reversal, as we're all aware, was aggravating circumstance (d), that the murder was especially heinous, atrocious, cruel or manifested exceptional depravity by ordinary standards of morality and intelligence, was found to be unconstitutionally vague by the Eighth Circuit.

That circumstance has since been redefined in *State v. Joubert* . . . and *State v. Palmer* . . . . And it's the State's position that in this case, both prongs of . . . that aggravating circumstance exist and that's primarily what the evidence will be; what the witnesses will be testifying to today.

(Filing 18, Tr. 1 at 78–79.)

Counsel for the defendant responded to the narrowing construction issue in his opening statement. He argued that the "second prong [exceptional depravity] which was applied to Mr. Moore in the original sentencing hearing was found to be unconstitutionally vague and it has not been remedied since by any cases." (Filing 18, Tr. 1 at 80.) Thus, at the start of the evidentiary hearing, the limiting construction debate had been joined. The

4. Filing 18 may be found in Boxes A & B.

prosecutor argued that "exceptionally depraved" had been limited by *Joubert* and *Palmer* and defense counsel disagreed.

At the evidentiary hearing on resentencing, the police officer who took Moore's confessions testified and was vigorously cross-examined. (Filing 18, Tr. 1 at 100–134). Received into evidence were various tape-recorded statements that Moore had given to the officer. (Filing 18, Tr. 2 at 207–208 (regarding Ex. 130); Filing 18 (envelope labeled "PSR"), Ex. 130.) Included in those statements were Moore's admissions that he planned the first robbery a number of days in advance by calling various cab companies to see how long it would take the cabs to arrive (e.g., filing 18, (envelope labeled "PSR"), ex. 130 at 265–68 (victim named Van Ness)) and had selected the victims because of their older ages (*id.* at 186 & 199 (victim named Helgeland); *id.* at 269 (victim named Van Ness)).

None of this evidence of planning or age selection could have been a surprise to Moore or his counsel since it had been presented in the first sentencing hearing and was extensively discussed by the Nebraska Supreme Court during the 1982 appeal as convincing proof of the "exceptional depravity" of Moore's crime. Moreover, in 1986, the first *Moore* opinion was cited as support for the *Joubert* decision and the *Joubert* decision emphasized the importance of planning and selection due to age as establishing "exceptional depravity."

After the evidentiary hearing concluded on June 30, 1994, both sides were given an opportunity to brief the case. (Filing 18, Tr. 2 at 218.) In a brief filed on July 26, 1994, Moore, through his counsel[5], argued that the "aggravating circumstances ... have not changed in any pertinent part by the legislature since the initial sentencing," the "issues to be considered in the present

hearing are exactly the same," and the State of Nebraska had failed to present "any new evidence relevant to these aggravators." (Filing 41[6], "Pre–Sentencing Brief" at Bates Stamp P–00344.) Moore went on to argue that "the second prong of aggravating circumstance 1(d), clearly cannot be considered in that in its present form it has been ruled to be unconstitutionally vague and therefore null and void." (*Id.* Bates Stamp P–00346.)

Two things are apparent from this brief, and both of them establish that Moore was not surprised. To start with, according to Moore, the factual "issues ... [were] exactly the same" as they had been 14 years earlier and he had been confronted with no "new evidence" at the evidentiary hearing. Even more importantly, and despite the fact that Moore knew from the opening statement of the prosecutor that the State was proposing a limiting construction following both *Palmer* and *Joubert,* Moore's counsel argued that the "exceptional depravity" aggravating circumstance should not be applied because it had previously been held unconstitutional. He thus elected not to propose a limiting construction or respond to the prosecutor's statement that *Palmer* and *Joubert* provided the appropriate limiting construction.

The parties were given oral argument, and that argument was held on October 14, 1994. (Filing 18, Tr. 2 at 219.) The record is replete with arguments about whether and how the "exceptionally depraved" language should be narrowed. During oral argument the parties argued about the meaning of significant cases such as *Palmer,* the 1986 Nebraska Supreme Court opinion in *Joubert,* Judge Cambridge's decision in *Joubert, Gretzler,* and *Walton. (Compare* Filing 18, Tr. 2 at 229–36 (prosecutor's arguments) *with* Filing 18, Tr. 2 at 268–269 (defense counsel's argu-

---

5. Moore's counsel was Thomas C. Riley, a very experienced public defender for Douglas County, Nebraska. Mr. Riley was specifically experienced in handling capital cases. (Filing 18, Tr. 1 at 12.) He was also assisted by Alan E. Peterson, counsel in this case, who

had been previously appointed to represent Moore by the Court of Appeals. (Filing 18, Tr. 1 at 1–12 & 77; Tr. 2 at 219.)

6. Filing 41 may be found in Box C.

ments).) As had been the case in opening statements some three months earlier, the State of Nebraska and Moore clearly framed the debate on limiting the meaning of "exceptional depravity," with each side using the appropriate legal precedents then available to them.

During oral argument Judge Rist questioned Moore's counsel about the age factor. The judge asked: "What about the testimony that he selected older men because he didn't want to kill younger ones?" (Filing 18, Tr. 2 at 263.) Moore's able counsel responded that there was no context within which to judge the statement and "that's what I was grilling [the police officer] on." (*Id.*) Once again, there is not the slightest indication that Moore's counsel was surprised by the focus of the judge's questioning.

Finally, in a starkly revealing exchange regarding the issue of surprise, Moore's counsel argued that "my position is you [the sentencing panel] can't on your own come up with a definition [of exceptional depravity] because in doing so, I can't rebut it." (*Id.* at 275.) Moore's counsel stated: "I suppose you could say I'm [the sentencing panel] going to come up with a definition now and you [the defendant] can go back and we'll give you another month to bring in evidence and see if this aggravator applies or not." (*Id.*) Moore's counsel, however, did not ask the court to use that procedure. (*Id.*)

Judge Rist responded: "You would be in the same position if the Supreme Court did it, though, wouldn't you?" (*Id.*) Counsel was then forced to admit: "Yes. I think so." (*Id.*) The defense lawyer then confessed his strategy: "[T]hen I am going to say but I never had a chance to argue with you about it because I didn't know what it was." (*Id.*) And, once again, the advocate did not ask the sentencing panel to alter the procedure. About six months after the October, 1994, oral argument, and on April 21, 1995, the panel announced its sentence.

In short, the record proves that counsel for Moore had a complete grasp of the "exceptional depravity" limiting construc-

tion issue and related procedural questions. The petitioner elected not to propose any particular limiting construction or ask for an advance limiting construction definition, hoping instead to preserve a procedural due process argument as "insurance." While this is proof of the sophistication and competence of Moore's experienced lawyer, it also establishes beyond any question that the petitioner was not surprised by the limiting construction used by the sentencing panel.

## III. CONCLUSION

Since his first appeal in 1982, the petitioner has demanded that the courts more clearly define the words "exceptional depravity." Over the intervening years, the refined definition that Mr. Moore sought was carefully, albeit incrementally, provided to him. Relying upon a cold, calculated plan, Moore committed two separate murders, purposefully selecting each victim because of older age. According to the more precise definition that Moore so vigorously solicited, this behavior was found to be "exceptionally depraved" by three experienced trial judges and seven thoughtful members of the Nebraska Supreme Court. Mr. Moore has no legitimate reason to be surprised.

IT IS ORDERED:

1. The Magistrate Judge's Recommendation (filing 49) that the Petition for Writ of Habeas Corpus (filing 1) be granted with respect to claims (1) and (2) is not adopted, and Respondent's objections to the Magistrate Judge's Recommendation (filing 50) are sustained;

2. The Magistrate Judge's Recommendation (filing 49) that claims (3) through (12) of the Petition for Writ of Habeas Corpus (filing 1) be denied is adopted, and Petitioner's objections to the Magistrate Judge's Recommendation (filing 51) are denied;

3. Petitioner's appeal (filing 51) from the Magistrate Judge's order (filing 49, at 32) denying Petitioner's request for an evi-

dentiary hearing and the Magistrate Judge's unstated, but implicit, denial of Petitioner's request for expansion of the record, is denied;

4. The Petition for Writ of Habeas Corpus (filing 1) filed pursuant to 28 U.S.C. § 2254 is denied in its entirety and is dismissed with prejudice;

5. Respondent's motion for partial summary judgment (filing 25) upon Petitioner's claim (10) is denied as moot because claim (10) has been considered and denied, as directed above, in the context of my adoption of the portion of the Magistrate Judge's Report and Recommendation dealing with claim (10);

6. Judgment shall be entered by separate document; and

7. My chambers staff shall give counsel for the parties immediate telephone and fax notice of this decision.

## ORDER, REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Before the court for consideration is the petition for writ of habeas corpus of Carey Dean Moore, filing 1. For reasons discussed more fully below, I conclude that petitioner has fairly presented claims (1) through (5), and (7) through (10). However, petitioner is in procedural default with respect to claims (6), (11), and (12). After reviewing petitioner's claims, I conclude that habeas relief should be granted with respect to claims (1) and (2) and denied in all other respects. I further conclude that an evidentiary hearing is not necessary to resolve petitioner's claims.

## BACKGROUND

Having waived a trial by jury, petitioner was tried by the District Court of Douglas County, Nebraska, of two counts of first degree murder in the perpetration of or attempt to perpetrate a robbery. On June 20, 1980, a panel of three judges sentenced him to death by electrocution on each count. Petitioner appealed his convictions and sentence to the Nebraska Supreme Court, which affirmed both. *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982). Subsequently, petitioner filed a motion for postconviction relief in the district court, which was denied without a hearing. The Nebraska Supreme Court affirmed. *State v. Moore*, 217 Neb. 609, 350 N.W.2d 14 (1984).

Petitioner then filed a petition for federal habeas relief in this court. CV 84–L–754, filing 1. I recommended to the district court that that petition be granted with respect to his claim that the "exceptional depravity" language in NEB.REV.STAT. ANN. § 29–2523(1)(d) was unconstitutionally vague, and denied with respect to the remaining claims. I recommended that Moore be resentenced to life imprisonment unless the State initiated capital resentencing proceedings within a reasonable time after judgment became final. CV 84–L–754, filing 41. The district judge, the Honorable Warren K. Urbom, adopted my recommendations and granted the writ of habeas corpus holding that the "exceptional depravity" language was unconstitutionally vague, denied all the other claims, and ordered the reduction of petitioner's sentence to life imprisonment unless the state initiated resentencing within sixty days after the judgment became final. *Id.*, filing 45. The Eighth Circuit affirmed, *Moore v. Clarke*, 904 F.2d 1226 (8th Cir.1990), and subsequently denied a motion for rehearing filed by respondent, *Moore v. Clarke*, 951 F.2d 895 (8th Cir.1991).

The respondent moved for resentencing in the Nebraska Supreme Court. Although the supreme court granted the motion, it did not reach either the issue of the constitutionality of NEB.REV.STAT. ANN. § 29–2523(1)(d) or the propriety of the death sentence in this case. *See State v. Moore*, 243 Neb. 679, 680, 502 N.W.2d 227 (1993). The court instead remanded the case to the District Court of Douglas County for resentencing. *Id.* The district court resentenced petitioner to death by electrocution. Petitioner appealed and the Nebraska Supreme Court affirmed the re-

sentence. *State v. Moore,* 250 Neb. 805, 553 N.W.2d 120 (1996). He then filed a petition for post-conviction relief in the state district court, which was denied without a hearing and affirmed by the Nebraska Supreme Court. *State v. Moore,* 256 Neb. 553, 591 N.W.2d 86 (1999).

Petitioner has now filed the present petition for writ of habeas corpus with this court raising the following grounds for relief:

(1) The Nebraska court's application of aggravating factor (1)(d) in NEB.REV. STAT. ANN. § 29–2523 violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights;

(2) The aggravating factor in NEB.REV. STAT. ANN. § 29–2523(1)(d) as redefined in this case, violates the Eighth and Fourteenth Amendments because it remains open-ended and vague and fails to "channel" application of the death penalty;

(3) The State violated the federal court's order giving it 60 days to initiate capital resentencing and petitioner is thus entitled to have his sentence reduced to life imprisonment;

(4) The death penalty in Nebraska is applied in an uneven, arbitrary and capricious manner, in violation of the Fourteenth Amendment due process clause and the Eighth Amendment prohibition against cruel and unusual punishment;

(5) The Nebraska death penalty scheme violates the Eighth Amendment prohibition against cruel and unusual punishment because it fails to channel the sentencer's discretion by objective standards and it sets forth two inconsistent standards of proof as a predicate to the imposition of the death penalty;

(6) The resentencing panel erroneously considered the defendant's custodial statements obtained by police authorities in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments and erroneously refused to grant the appellant an evidentiary hearing to test the constitutional validity of such statements in violation of the due process clause of the Fourteenth Amendment;

(7) The proportionality review provided for in NEB.REV.STAT. ANN. § 29–2522 violates Petitioner's rights under the Fourteenth Amendment due process clause and the Eighth Amendment cruel and unusual punishment clause;

(8) The aggravating factor in NEB.REV. STAT. ANN. § 29–2523(1)(b) violates the Fifth, Eighth, and Fourteenth Amendments;

(9) Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel during sentencing when counsel did not determine how to effectively rebut the presence or relative weight of the aggravating factor in NEB.REV.STAT. ANN. § 29–2523(1)(d) under the definition ultimately chosen by the sentencing panel;

(10) The sentence of death is being inflicted in a cruel and unusual manner, in violation of the Eighth Amendment, because Petitioner has already served more than nineteen years of prison time in isolated, segregated confinement, while under several explicit threats of death, due to protracted delays in the court proceedings caused by ineffective assistance of his counsel and by the State;

(11) Nebraska's death penalty system violates the Sixth, Eighth and Fourteenth Amendments in failing to provide a jury determination of factual aggravators and mitigators; and

(12) Nebraska's death penalty by electrocution violates the Eighth and Fourteenth Amendments.

*See* Petitioner's Brief & Filing 1.

## DISCUSSION

### *EXHAUSTION AND PROCEDURAL DEFAULT*

The exhaustion doctrine, first enunciated in *Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886) and currently codified at 28 U.S.C. § 2254(b), is ground-

ed in principles of comity and reflects a desire to "protect the state courts' role in the enforcement of federal law." *Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989) (quoting *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)). It is also justified by the pragmatic recognition that "federal claims that have been fully exhausted in state courts will more often be accompanied by a complete factual record to aid the federal courts in their review." *Id.* (quoting *Rose*, 455 U.S. at 519, 102 S.Ct. 1198). Although not jurisdictional, it "creates a 'strong presumption in favor of requiring the prisoner to pursue his available state remedies.'" *Id.* (quoting *Rose*, 455 U.S. at 515, 102 S.Ct. 1198).

■ The exhaustion requirement may be satisfied in either of two ways: by "fair presentment" of the claim; or by procedural default. A claim is properly exhausted by presentment when the state courts are given a "'fair opportunity' to apply controlling legal principles to the facts bearing upon [the claim]." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Id.* (citing *Picard*, 404 U.S. at 277, 92 S.Ct. 509). The *Harless-Picard* "fair opportunity" standard is satisfied where the petitioner presents "the same facts and legal theories to the state court that he later presents to the federal courts." *Jones v. Jerrison*, 20 F.3d 849, 854 (8th Cir.1994). Specifically, "[t]he federal legal theory or theories must plainly appear on the face of the petitioner's state-court briefs." *Id.* A "federal legal theory" is one containing a reference to

"a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Martin v. Solem*, 801 F.2d 324, 330–31 (8th Cir.1986) (citing *Thomas v. Wyrick*, 622 F.2d 411, 413 (8th Cir.1980)); *see Jones*, 20 F.3d at 854 (requiring "[e]xplicit citation to the Constitution or to a federal case"); *Luton v. Grandison*, 44 F.3d 626 (8th Cir.1994) (same); *McDougald v. Lockhart*, 942 F.2d 508, 510 (8th Cir.1991) (same). It is not necessary that the petitioner obtain a precise ruling on the federal claim from the state court, so long as it has been properly presented. *See Tyler v. Gunter*, 819 F.2d 869, 870–71 (8th Cir. 1987).

■ In this case the petitioner has "fairly presented" claims (1) through (10) in the state court proceedings in connection with his resentencing. In his direct appeal from resentencing, petitioner presented arguments that were substantially similar, both factually and legally, to claims (1) through (8) in the present petition. *See* Brief of Appellant, R–I 00060–00099. Petitioner's motion for postconviction relief and his appeal from the denial of that motion also included factually and legally similar arguments to claims (1), (2), (9), and (10). *See* Motion for Post Conviction Relief, R–I 00246–00251; Brief of Appellant, R–I 00025–00042.

■ Claims (11) and (12), however, were not fairly presented. Petitioner included neither the facts nor the legal theories relevant to these claims in any of his briefs to the Nebraska Supreme Court. These two claims were available to petitioner and could have been raised during either the state direct appeal or postconviction proceedings.[1] Consequently, petitioner has no available means by which to present

---

1. With respect to claim (11), petitioner could have raised this claim in the state proceedings the same way he raised a similar claim in his original federal habeas petition. *See Moore v. Clarke*, CV84–L–754 (D.Neb.), report and recommendation dated May 23, 1988 at p. 35, *adopted,* slip op. dated September 20, 1988

(Urbom, J)(denied on the merits). As is evident from *State v. Mata*, CR 99–52, an opinion from the District Court for Keith County, Nebraska, questioning the constitutionality of electrocution as a method of execution, petitioner could have also raised claim (12) in state court.

these claims to the Nebraska courts at this time, *see State v. Luna,* 230 Neb. 966, 967, 434 N.W.2d 526 (1989), and they are subject to procedural default. *Jones v. Jerrison,* 20 F.3d 849, 854 (8th Cir.1994). Also, because petitioner does not even attempt to demonstrate either cause or prejudice sufficient to excuse this default, *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), or evidence of actual innocence, *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), claims (11) and (12) are barred and may not be considered by this court.

Respondent argues that petitioner is in procedural default with respect to claims (4), (5), (6), and (8). Specifically, respondent contends that even if petitioner properly presented these claims in the state proceedings related to his resentencing, these claims were available in the proceedings related to his original sentence and should have been raised in his first federal habeas petition.

■ Under section 2244(b)(2) "[a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed...." 28 U.S.C. § 2244(b)(2). However, a second habeas petition attacking for the first time the constitutionality of a newly imposed sentence is not a "second or successive petition" and it is not subject to § 2244(b)(2) limitations. *See In re Taylor,* 171 F.3d 185, 187–88 (4th Cir.1999) (habeas petition raising new issues is not second or successive where those issues originated at resentencing); *Walker v. Roth,* 133 F.3d 454, 455 (7th Cir.1997) (petition challenging aspects of resentencing that could not have been raised in the first petition is not a second or successive petition within the meaning of AEDPA); *Galtieri v. United States,* 128 F.3d 33, 37–38 (2d Cir.1997) (to the extent new petitions seek to vacate a new, amended component of the sentence they are not to be considered second or successive); *United States v. Scott,* 124 F.3d 1328, 1330 (10th Cir.1997) (prisoner's motion to vacate was not successive where

his first motion to vacate resulted in resentencing and reinstatement of his right to direct appeal).

■ Claims (4), (5), and (8) challenge the constitutionality of his resentencing and he does not present any claims challenging his conviction or original sentences. Had he sought to challenge aspects of his conviction or his first sentences, this petition would then be considered successive and would have to be dismissed unless the statutory exceptions were met. However, through claims (4), (5), and (8) petitioner is attempting to challenge the constitutionality of only the resentencing proceedings, which occurred after he obtained relief in his original habeas petition. Therefore, I conclude that the present petition cannot be considered a second or successive petition with respect to claims (4), (5), and (8) because it is petitioner's first federal challenge to the proceedings that resulted in his current death sentences. Thus, these claims are not barred by petitioner's failure to raise them in his original federal habeas petition.

■ Claim (6) differs from claims (4), (5), and (8) in that its legal underpinning—violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment right—was previously decided against him in the trial phase of the case and was unchallenged on appeal. Thus, that ruling became the law of the case and was binding on Moore. Respondent argues with respect to claim (6) that petitioner should be barred from receiving federal habeas relief because the Nebraska Supreme Court held in the direct appeal from his resentencing that he had failed to comply with a state procedural rule by not litigating this claim in the direct appeal of his original conviction and sentences. *See State v. Moore,* 250 Neb. 805, 831–32, 553 N.W.2d 120 (1996). It is well established that in the context of a federal habeas proceeding the court cannot not review state court decisions that rest on an adequate and independent rule of state law. *Coleman v. Thompson,* 501

U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Under this rule, a reviewing court is required to decline review on the merits of a claim that the state court refused to address because the petitioner failed to meet a procedural requirement. *Coleman, supra; Tokar v. Bowersox,* 198 F.3d 1039, 1051 (8th Cir.1999)(claims challenging prosecutor's statements at trial were procedurally defaulted where they were not raised on direct appeal to state supreme court). The court may address the merits of a defaulted claim only if the default is cured by a showing of either cause and prejudice or fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *see also McCleskey v. Zant,* 499 U.S. 467, 495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

During his pretrial proceedings petitioner filed a motion to suppress the statements he now contends the resentencing panel should not have considered; the motion was denied. *See* Judge's Minutes, R–II 00441. He, however, failed to litigate the admissibility of these custodial statements in his direct appeal, and the Nebraska Supreme Court has not addressed this claim. It is clear that at the time petitioner filed his original appeal, Nebraska law barring relief on available claims not raised during direct appeal was already well-established. *See State v. Partridge,* 201 Neb. 799, 272 N.W.2d 366 (1978)(further consideration of claims was precluded where the evidence showed failure to appeal was not the fault of petitioner's counsel). Consistent with this law, the Nebraska Supreme Court found petitioner in procedural default with respect to claim (6). Because petitioner does not even attempt to excuse this default in any manner, this court cannot further consider this claim. *Coleman, supra.*

### TEAGUE DEFENSES

■ Finally, respondent argues that allowing the petitioner relief upon his remaining claims would represent the establishment of "new rules" of federal constitu-

tional law and this would run afoul of the rule announced in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The *Teague* rule prevents a federal court from granting habeas relief based on a rule announced after a conviction and sentence became final. *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). In this case petitioner's resentencing was final as of April 14, 1997, the date the Supreme Court of the United States denied his petition for certiorari. *Penry v. Lynaugh,* 492 U.S. 302, 314, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). A "new rule" under the *Teague* decision is one that "is not dictated by precedent and, if adopted, would contravene well established precedents." *Smith v. Groose,* 205 F.3d 1045 (8th Cir.2000)(citing *Saffle v. Parks,* 494 U.S. 484, 486, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)).

In this case petitioner does not ask for a "new rule" in any of his remaining claims. Petitioner cites as legal authorities *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), with respect to claims (1), (2), (3), (4) and (8).

With respect to claims (9) and (10) petitioner cites to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), respectively, as his legal authority. Although petitioner did not cite to any authority to support claims (5) and (7), he does not concede the *Teague* rule bars these claims.

Claim (5) alleges that the Nebraska death penalty statutes fail to adequately channel the sentencer's discretion by including inconsistent standards to weigh aggravating and mitigating circumstances,

and that the statutes' use of the term "approach" makes it vague. The standards for evaluating claims of this nature were established by *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).[2] Claim (7) argues that the proportionality review provided in Nebraska law violates the Fourteenth Amendment due process and the Eighth Amendment prohibition against cruel and unusual punishment. Standards for considering such claims were established in *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

Were the court to grant relief on any of petitioner's claims, including claims (5) and (7), that action would not be tantamount to establishing "new rules" in contravention of *Teague* because the authority supporting the claims, whether cited or not, was already established at the time petitioner's resentencing became final upon the United States Supreme Court's denial of his petition for certiorari on April 14, 1997, *see Moore v. Nebraska*, 520 U.S. 1176, 117 S.Ct. 1448, 137 L.Ed.2d 554 (1997). Therefore, I conclude respondent's *Teague* defense with respect to all of petitioner's remaining claims lack merit.

### STANDARD OF REVIEW

On April 24, 1996, President William J. Clinton signed into law the Antiterrorism Effective Death Penalty Act, which enacted statutory provisions regarding the standard of review in federal habeas corpus cases. *See* 28 U.S.C. § 2254 (West 1994 & Supp.1998). Under the new provisions, for questions of fact, a federal court may grant habeas relief only if the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2) (West Supp.1999). Additionally, a federal court must presume that a

factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West Supp.1999).

Section 2254(d)(1) states that a federal court may not grant a writ of habeas corpus unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1) (West Supp.1998). As explained by the Supreme Court in its recent decision in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Court's prior holdings or if it reaches a different result from one of the Court's cases despite confronting indistinguishable facts. 120 S.Ct. at 1516.

### MERITS

#### Claims (1),(2), and (9)

Claims (1) and (2) challenge, respectively, the constitutionality of the application and reformulation of the NEB.REV.STAT. ANN. § 29–2523(1)(d) "exceptional depravity" aggravating factor.[3] Specifically, petitioner argues that the resentencing panel erred in applying the 29–2523(1)(d) aggravating circumstance because it is unconstitutionally vague, *see Moore v. Clarke*, 904 F.2d 1226, 1229 (8th Cir.1990)(quoting *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759; *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976))(hereinafter *Moore I* ), and because there was no constitutionally valid construction of this aggravator for the panel to apply. In his second claim, petitioner argues that the resentencing panel's reformulation of the

---

2. Petitioner in fact cites to *Tuilaepa* in connection to this claim, but only in relation to the Nebraska Supreme Court reliance on the case in its ruling against him.

3. Section 29–2523(1)(d) provides as follows:

The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.

NEB.REV.STAT. ANN. § 29–2523(1)(d) (Reissue 1995).

29–2523(1)(d) violated his constitutional rights because it remains open-ended and vague and fails to "channel" the application of the death penalty, and because it was done in an ex post facto manner depriving him of notice of the elements involved. In the alternative, petitioner argues in claim (9) that if the resentencing panel's formulation of the 29–2523(1)(d) aggravating circumstance is found by this court to be reasonably ascertainable in advance, petitioner's counsel was then ineffective for not determining how to effectively rebut the presence or weight of the possible facts establishing the aggravating circumstance.

It is well-established that "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (citations omitted). A state has the "constitutional responsibility" to set "clear and objective standards" that provide "specific and detailed guidance" to sentencers and that "make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In reviewing the propriety of these standards, the court must determine not only whether these standards are facially constitutional, but also whether the state supreme court has narrowly construed these standards by providing objective criteria to apply them, *Godfrey*, 446 U.S. at 423, 100 S.Ct. 1759; *Gregg v. Georgia*, 428 U.S. 153, 201, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and whether this objectively limiting construction is followed, *see Godfrey*, 446 U.S. at

428–33, 100 S.Ct. 1759 (stating that a constitutionally narrowed construction cannot stand where it is not followed).

As petitioner correctly states, it has been established that the "exceptional depravity" language is unconstitutionally vague on its face. *Moore I, supra.* In petitioner's original habeas litigation, the Eighth Circuit also held that the attempted constructions of "exceptional depravity" at the time of petitioner's sentencing [4] failed to provide objective and specific criteria limiting the sentencer's discretion. *Id.* at 1230–31. Even though it was not necessary to support its ultimate ruling, the Eighth Circuit also discussed the five-factor construction established in *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).[5] *Id.* at 1231. The Eighth Circuit questioned, as this court had done before it, *see Moore v. Clarke*, CV84–L–754, slip op. at 4–6 (D. Neb Sept. 20, 1988), the constitutional validity of the *Palmer* construction. The circuit first stated that if the Nebraska Supreme Court wanted to reformulate its prior interpretations of the vague "exceptional depravity" language in *Palmer*, it had failed to do so because *Palmer* could neither be reconciled with prior Nebraska cases nor did it specifically state that it was abandoning prior constructions. *Id.* at 1231–32. Secondly, the court commented that *Palmer*'s attempt to articulate an objective, limiting construction also failed because two of its factors, the "senselessness of the crime" and "the helplessness of the victim" factors, are subjective in nature and provide no assistance in restraining a sentencer's discretion. *Id.*

The *Palmer* construction was seemingly redeemed to some extent when the Su-

---

**4.** The Eighth Circuit's discussion included the "so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life" and the "unresisting victims" constructions.

**5.** The *Palmer* decision, which came approximately two years after petitioner's original, held that "exceptional depravity" in a murder existed when it was shown, beyond a reason-

able doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim. *Palmer*, 224 Neb. at 320, 399 N.W.2d 706.

preme Court recognized as valid a similarly-worded construction in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) and *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). In *Walton* and *Jeffers,* the Supreme Court addressed the adequacy of an Arizona death penalty statute with language similar to section 29–2523(1)(d). The statute in those two cases designated a murder committed in "an especially heinous, cruel or depraved manner" as an aggravating factor to be weighed in determining the imposition of a death sentence. ARIZ. REV. STAT. ANN. § 13–703(F)(6) (Supp. 1988). The Supreme Court sustained application of that language as it had been narrowed by construction in *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (en banc), *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983),[6] in both cases. *Walton,* 497 U.S. at 654, 110 S.Ct. 3047; *Jeffers,* 497 U.S. at 783, 110 S.Ct. 3092.

Despite the Supreme Court's recognition of the *Gretzler* test, I conclude the similarly-worded *Palmer* construction did not provide the petitioner's resentencing panel with a constitutionally valid construction of "exceptional depravity" at the time of petitioner's resentencing.

The *Palmer* test fails to limit the sentencing panel's discretion for the same reasons previously stated by this court and the Eighth Circuit in *Moore I.* First of all, the test still includes factors (4) ("senseless of the crime") and (5) ("helplessness of the victim"), which this court and the Eighth Circuit considered too subjective. Although these two factors are also present in the constitutionally valid *Gretzler* test, a closer reading of the Arizona opinion reveals they are included in a completely different manner in that test. The *Gretzler* court stated that senselessness of the crime and helplessness of the victim were to be considered, individually or jointly, "together with other circumstances present in a particular case" to determine whether a murder was heinous or depraved. *Gretzler,* 135 Ariz. at 52, 659 P.2d 1. In a later case, but before the Supreme Court's review in *Walton* and *Jeffers,* the Arizona Supreme Court further specified that absent additional factors, neither of those two factor alone would lead to a finding of heinousness or depravity. *State v. (Bernard) Smith,* 146 Ariz. 491, 503, 707 P.2d 289 (1985) (citing *Gretzler*); *see also Ortiz v. Stewart,* 149 F.3d 923, 941 n. 1 (9th Cir.1998) (citations omitted).

In contrast, the *Palmer* test does not limit the significance of the "senselessness of the crime" and "helplessness of the victim" factors in any way. In fact, these two factors carry the same weight as the first three in an "exceptional depravity" determination in this construction. This is evident from language in *Palmer* stating that "exceptional depravity" may be established "when it is shown, beyond a reasonable doubt, that the [five circumstances], *either separately or collectively,* exist in reference to a first degree murder." *Palmer,* 224 Neb. at 320, 399 N.W.2d 706 (emphasis added). Factors (4) and (5) are simply too subjective to constitutionally narrow, by themselves, the "exceptional depravity" language. As the Eighth Circuit stated in *Moore I,* the term "helplessness" "encompasses a much broader, and potentially a circular, meaning" because "[a]ll murder victims could be characterized as 'helpless,' as evidenced by the fact that they were murdered." *Moore I,* 904 F.2d at 1231. With respect to the "senselessness of the crime" factor, I also agree with this court's and the Eighth Circuit's previous conclusion that the term has no objective meaning and that if it "were sufficient to permit a death penalty, virtually all murderers would be on death row." *Id.* at 1232.

Furthermore, even if this court were to conclude that the *Palmer* construction it-

---

**6.** *Gretzler* held that factors that can establish the aggravating circumstance of "heinousness or depravity" in a murder include: (1)relishing of the murder by killer; (2)infliction of gratuitous violence on victim; (3)needless mutilation of victim; (4)senselessness of the crime; and (5) helplessness of victim. *Gretzler,* 135 Ariz. at 52, 659 P.2d 1.

self is constitutionally valid, as the Eighth Circuit stated in *Joubert v. Hopkins*, 75 F.3d 1232, 1244 (8th Cir.1996),[7] I would still conclude that when *Palmer* is considered with earlier constructions it does not properly avoid the arbitrary and capricious infliction of the death penalty. This court concluded in petitioner's original habeas litigation, and the Eighth Circuit agreed, that the pre-*Palmer* formulations were constitutionally vague. *Moore*, CV84–L–754, slip op. at 3–4. In addition, this court also stated that the Nebraska Supreme Court's attempt to reinterpret "exceptional depravity" in *Palmer* failed because the construction "looks nothing like the pre–1986 illustrations," and because if the *Palmer* court "intended to abandon its pre–1986 efforts at guidance, it did not say so distinctly." *Id.* at 4.

Nothing has changed in the present litigation. The Nebraska Supreme Court has neither abandoned nor expressed a desire to abandon pre-*Palmer* constructions that have been held to be constitutionally invalid. In fact, in its opinion affirming petitioner's resentence, the Nebraska Supreme Court stated clearly that it has "maintained that both the *Palmer* factors and the 'coldly calculated' language from previous decisions provided sufficient guidance to the sentencing authority." *State v. Moore*, 250 Neb. 805, 817, 553 N.W.2d 120 (1996). This reluctance of the state's supreme court to abandon prior constructions has left the sentencer, as this court previously stated, with a "series of suggestions, some objective and some not, from which to choose, without assurance that the series is complete." *Moore*, CV84–L–754, slip op. at 4. The "exceptional depravity" aggravator, thus, lacked a definite con-

struction to properly narrow the resentencing panel's discretion. Therefore, I conclude the resentencing panel committed constitutional error in considering this aggravator to resentence the petitioner. *See Espinosa v. Florida*, 505 U.S. 1079, 1081, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992)(in state where sentencer weighs aggravating and mitigating circumstances in determining whether to impose death sentence, weighing of invalid aggravating circumstance violates Eighth Amendment); *see also Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (where the sentencing jury considers an invalid factor, the weighing process may be impermissibly skewed).

Petitioner argues in claim (2) that even if the application of (1)(d) as formulated in *Palmer* was not constitutionally infirm, the resentencing panel's reformulation of the 29–2523(1)(d) aggravator violates the Eighth and Fourteenth Amendments because it remains open-ended and vague and fails to "channel" the application of the death penalty.

As discussed, a limiting construction can be used to give content to an unconstitutional aggravator, but only if the construction itself is constitutionally valid. A narrowing construction is constitutionally sufficient if it "provide[s] some guidance to the sentencer." *Walton*, 497 U.S. at 654, 110 S.Ct. 3047. In this case the resentencing panel, having concluded that there was no constitutionally valid interpretation of the "exceptional depravity" language,[8] decided to apply this aggravator by formulating its own limiting construction. The construction lists the following factors:

---

**7.** I do not consider the Eighth Circuit's brief statement on the constitutionality of the *Palmer* test in *Joubert* to be binding on this court. First, the comment was of no consequence to the Eighth Circuit's actual holding that the vagueness claim with respect to the "exceptional depravity" aggravator in that case was procedurally barred. *See Joubert*, 75 F.3d at 1240–44. Thus, I consider that comment to be dicta. Secondly, the comment was just a general conclusion without significant analy-

sis. The *Joubert* court simply cited to *Walton* as its authority and did nothing else. *Id.* at 1244. Such reliance on *Walton* is misplaced because, as discussed above, the *Gretzler* test, the test addressed in *Walton*, is not identical to the *Palmer* construction.

**8.** The Nebraska Supreme Court disagreed with this conclusion. *Moore*, 250 Neb. at 819, 553 N.W.2d 120.

(1) the killer's infliction of prolonged or significant physical violence, such as sexual abuse, on the victim after the victim's death or loss of consciousness . . .; (2) the killer's mutilation or dismemberment of the victim's body after death . . .; (3) the apparent relishing of the murder by the killer, as exemplified by manifestations of satisfaction, gratification, enjoyment, or pleasure at the victim's suffering or death . . . .; (4) the killer's cold and calculated planning of the victim's death, as exemplified by [i] experimentation with the method of causing the victim's death or [ii] by the purposeful selection of a particular victim on the basis of specific characteristics such as race, gender, creed, sexual orientation, disability, or age . . . .

See Order of Sentence, R–I 000158, 00170. The only factor of importance in this discussion is factor (4)(ii) because it was the factor the resentencing panel found present in petitioner's case.[9]

First, I consider the definition of "exceptional depravity" as the "cold and calculated planning of each victim's death" as evidenced by "the purposeful selection of a particular victim on the basis of specific characteristics" to be different in kind from the other formulations in this construction. The resentencing panel's first three criteria for finding "exceptional depravity," as well as prior definitions, concentrate on determining the killer's state of mind by looking at his actions, during and beyond the killing, and the killer's enjoyment and satisfaction derived from performing the acts themselves. In fact, the *Palmer* factors and the prior constructions given to this aggravator, even if vague, all pointed in the direction of evaluating the nature of the acts done in the course of the killing incident. *See State v. Holtan,* 197 Neb. 544, 546, 250 N.W.2d 876 (1977)(the killing and attempted killing of "unresisting victims" during a robbery found to be indicative of a state of mind totally and "senselessly bereft of regard for human life"); *State v. Peery,* 199 Neb. 656, 675, 261 N.W.2d 95 (1977) (defendant's murder of the victim by shooting her between the eyes, in the right temple, and in the mouth while she was thoroughly bound and not offering any resistance or posing a threat to the defendant, was "so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life"); *State v. Ryan,* 233 Neb. 74, 444 N.W.2d 610, (1989)(it was found that defendant relished the murder, inflicted gratuitous violence and that the victim was helpless where defendant had the victim tied and chained, then repeatedly sodomized him, whipped, beat, shot, and skinned him, broke his legs, and directed others to inflict extreme suffering on him). Both "sub-prongs" of the resentencing panel's fourth factor, however, address actions taken by the killer perhaps a significant period of time before the murder.

I must note that despite the difference just mentioned, the first sub-prong in the panel's fourth factor, experimentation with the method of death, possibly could reflect some aspect of the killer's reveling in the murderous acts by his deliberate selection of specific methods. Thus, like the first three factors in the resentencing panel's construction, it appears to be related to the killer's actions during the incident.

The method of selecting the victim, however, need have nothing to do with the grizzly deeds of the murder itself. It may or may not indicate hatred or antipathy toward a particular group, as implied by the resentencing panel. While a method of selection may itself evidence some sort of psychological depravity, it may well be a different kind of depravity that decides a swift and clean killing is not enough. The identity of the victim may make no difference to a killer who seeks satisfaction in the pain and gore of the deed. It is therefore seen as different in kind from every-

---

9. I must note that the first three factors in this reformulation are similar to the *Palmer* factors this court implicitly found to be constitu-tionally objective. *See Moore,* CV84–L–754, slip op. at 4.

thing else previously thought to be included in this prong of (1)(d).

The troubling *sequitur* from this expansion of the "exceptional depravity" prong to include actions other than the killing itself, is that it begs the question of what else it might be expanded to include. There is no limit placed upon such expansions, and thus, no "channeling" of the sentencer's discretion in selecting the ultimate penalty. The sentencer still has, as Judge Urbom concluded in petitioner's original habeas, "a series of suggestions, some objective and some not, from which to choose, without assurance that the series is complete." *Moore*, CV84–L–754, slip op. at 4.

Another troubling aspect of the resentencing panel's sub-prong is that it is, itself, open ended. The sub-prong is worded as "purposeful selection of the victim on the basis of specific characteristics *such as* race, gender, creed, sexual orientation, disability, or age." The use of "characteristics" implies something about the victim which makes that person one of a class of persons, seemingly identifiable by an unalterable condition, but that is not altogether clear. What other "characteristics" might be included? A killer may have a "purpose" of ridding the world of a class of persons he or she finds unworthy of life, but who do not fit these classifications. The use of the "such as" language opens this factor to a myriad of seemingly limitless applications.[10]

Finally, I find that the sentencing panel created this "selection of the victim" sup-prong based strictly on the facts of this case.[11] In *Maynard* the Supreme Court rejected an Oklahoma's court application of a vague aggravator where that court simply reviewed the circumstances of the murder and concluded the facts of the case made out the aggravating circumstance. *Maynard, supra.* Although calling the "selection of the victim" a factor gives the sentencing panel's actions an air of objectivity, the truth is they engaged in the same practice the Supreme Court rejected in *Maynard.* The panel reviewed the facts of petitioner's case, as is evident from their citing of petitioner's first appeal to the Nebraska Supreme Court, and then, for all practical purposes, concluded that those facts made out the "exceptional depravity" aggravator by creating the "selection of the victim" factor. *See* Order of Sentence, R–I at 000171–72.

In considering this case, the Nebraska Supreme Court did not address these expansive aspects. It seemingly, though not explicitly, approved the method utilized by the resentencing panel, and in addition, restated its holding that the *Palmer* factors remained in effect at the time of petitioner's resentencing, adding that the "coldly calculated" factor was an alternative. Therefore, I conclude that defining "exceptional depravity" as the "cold and calculated planning of each victim's death" as evidenced by "the purposeful selection of a particular victim on the basis of specific characteristics such as . . . age" fails to properly "channel" the sentencer's discretion and is in contravention of Supreme Court precedent.

Petitioner further argues in claim (2) that the panel's application of its construction violated his due process rights because it was done in an ex post facto

---

10. For example, what about a killer targeting prostitutes? Or high school dropouts? Or owners of cell phones? Or persons with tatoos (or other visible, permanent, non-disabling characteristics, such as moles, color of eyes, hair, etc.)? What if the killer targeted for "mercy killing" only persons who have some terminal, degenerative disease that has not yet "disabled" them?

11. At the time of the resentencing, the only other Nebraska capital case to have found this factor was that of John Joubert, and aggravator (1)(d) was found by this court to be unconstitutional as applied to him, *see Joubert v. Hopkins*, 8:CV91–00350, mem. op. (D.Neb. Oct. 11, 1994). On appeal to the Eighth Circuit, that judgment was reversed on the grounds that Joubert had not fairly presented that claim in state court on January 25, 1996. *Joubert*, 75 F.3d at 1241. The direct appeal of petitioner's sentence was decided on September 27, 1996.

manner depriving him of notice of the elements involved and of the opportunity to respond and present evidence to rebut the facts necessary to establish the newly defined aggravating circumstance. It is well-established that the Due Process Clause protects criminal defendants against novel developments in judicial doctrine. *See, e.g., Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Thus, it has been held that an unforeseeable judicial construction of a criminal statute may run afoul of the Due Process Clause if it lacks "fair warning of that conduct which will give rise to criminal penalties." *Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). However, neither the Supreme Court nor the lower courts have addressed a similar type of challenge with regard to a judicial construction of a sentencing statute.

In *Coleman v. McCormick,* 874 F.2d 1280 (9th Cir.1989)(en banc), the Ninth Circuit held that the retroactive application of a new death penalty statute in a defendant's resentencing violated due process. *Id.* at 1286. In its analysis, the court explained that because the death penalty statute that was in effect when defendant was originally tried and sentenced made the death sentence mandatory once a defendant had been convicted of the crime of aggravated kidnaping, the only factor during trial that determined whether defendant would get the death penalty "was whether or not he was convicted of aggravated kidnaping." *Id.* (citing REV.CODE MONT. § 94–5–304 (1947) (repealed 1977)). The death sentencing scheme was then changed to one that balanced aggravating and mitigating factors in a separate post-trial proceeding, and that scheme was applied in defendant's resentencing. *Id.*

The Ninth Circuit recognized that the ex post facto clause did not apply in defendant's case because, as the Supreme Court had reiterated in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the ex post facto clause does not " 'limit the legislative control of remedies

and modes of procedure which do not affect matters of substance.' " *Id.* (quoting *Dobbert,* 432 U.S. at 293, 97 S.Ct. 2290). The court stated, however, that "the due process clause protects individuals' rights to fundamentally fair procedures before they are deprived of their liberty rights," and that in capital sentencing cases, the court especially had "the obligation to scrutinize closely the sentencing procedures against 'fundamental principles of procedural fairness.' " *Id.* (citing *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 161, 71 S.Ct. 624, 95 L.Ed. 817 (1951); *Presnell v. Georgia,* 439 U.S. 14, 16, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)). In closing, the court added that defendant "has a legitimate interest in the character of the procedure which leads to the imposition of [the death] sentence....,' " *Gardner,* 430 U.S. at 358, 97 S.Ct. 1197, and that his "right to notice and to fair warning of the conduct that impacts upon his liberty is a basic principle long recognized by the Supreme Court." *Id.* at 1288 (citing *Bouie,* 378 U.S. at 350–51, 84 S.Ct. 1697; *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)). Thus, the Ninth Circuit concluded, the application of the new death penalty statute to defendant's case effectively denied him of his due process rights because he "had no reason to suspect that his decisions at trial would come back to haunt him at a sentencing hearing" and did not have the opportunity to apply an effective trial strategy that could have prevented his death sentence. *Id.*

Although petitioner's due process challenge is not the same as that presented in *Coleman,* I conclude the Ninth Circuit's legal reasoning equally applies in this case. At the time of petitioner's original conviction and sentence there were three potential limiting constructions of the "exceptional depravity" aggravator: the "unresisting victims" construction adopted in *State v. Holtan,* 197 Neb. 544, 250 N.W.2d 876 (1977); the "so coldly calculated as to

indicate a state of mind totally and senselessly bereft of regard for human life" construction from *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977); and the construction adopted in *State v. Simants*, 197 Neb. 549, 566, 250 N.W.2d 881 (1977), stating that the term exceptional limited the application of the aggravator "where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence." None of these constructions gave the defendant notice that confessing that he selected the cab drivers in part on the basis of age would have such weight in the "exceptional depravity" determination during both his original sentencing and his resentencing hearings. Thus, although it is not certain, it is at least arguable that defendant's counsel would have adopted a different trial strategy in order to lessen the impact of defendant's confession. Therefore, following *Coleman*'s application of Supreme Court precedent, I conclude that the application of the panel's construction failed to accord petitioner due process.

Finally, in claim (9) petitioner argues that even if the resentencing panel's construction was found not to be violative of his due process rights, his counsel during resentencing was ineffective for not determining how to effectively rebut the presence or weight of the possible facts establishing the aggravating circumstance. I disagree.

In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-part test for evaluating ineffective assistance of counsel claims. In order to demonstrate that counsel was constitutionally ineffective, a petitioner must show that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. "[R]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." *Id.* at 687, 104 S.Ct. 2052. In addition to demonstrating that

counsel's performance fell outside the "wide range of reasonable representation," petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

In this case, assuming there was no due process violation, petitioner does not overcome the presumption that counsel's conduct did not fall "within the wide range of reasonable representation." He fails to explain how counsel could have effectively rebutted the presence or weight of his confession, which ultimately established the "exceptional depravity" aggravator. Therefore, I conclude this claim has no merit.

### Claim (3)

In this claim, petitioner argues that his sentence should summarily be reduced to life imprisonment because the State failed to comply with this court's order requiring it to commence sentencing within sixty days. Respondent replies that the State complied with the federal court order because it petitioned the Nebraska Supreme Court to intervene and reweigh aggravating circumstances within the time period ordered and at the time that court had the authority to reweigh the aggravating and mitigating circumstances involved.

Under *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), in the instance an aggravating circumstance is found invalid, a state appellate court may reweigh the aggravating and mitigating circumstances or undertake a harmless error analysis without offending federal constitutional principles if state law authorizes such action. *Id.* at 747, 110 S.Ct. 1441. Although recently the Nebraska Supreme Court stated that its past assertion of authority under state law to reweigh and resentence was erroneous, *State v. Reeves*, 258 Neb. 511, 527, 604 N.W.2d 151 (2000), I conclude that decision is of no consequence in this case. First of all, at the time the State petitioned the Nebraska Supreme Court to intervene and

reweigh the aggravating circumstances, it was at least debatable whether the court had authority to do so. Thus, there was not an unreasonable application of *Clemons.* Furthermore, unlike *Reeves,* where the state supreme court actually resentenced the defendant, *see id.* at 526, 604 N.W.2d 151, in this case the supreme court neither reweighed the aggravating and mitigating circumstances nor did it resentence petitioner. Instead, the supreme court remanded the case to the district court for resentencing. Therefore, I conclude the State complied with this court's order, and this claim has no merit.

### Claim (4)

 Petitioner contends that the death penalty is applied in an uneven, arbitrary, and capricious manner in violation of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because there is a geographic disparity across Nebraska in the procedures used in sentencing criminal homicides. Specifically, he argues that prosecutors in Douglas County, where he was tried, are required to present evidence of aggravating circumstances to the sentencing body, while prosecutors in other areas, such as Lancaster County, have the discretion to elect not to present such evidence. Petitioner states that as result of this disparity, sentencing panels in Douglas County must consider the death penalty in all first degree murder cases.

The Supreme Court has held that discretionary action in the processing of murder cases under state law, such as prosecutors' authority to select persons they wish to prosecute for a capital offense, does not support the argument that the death penalty is being applied in an arbitrary and capricious manner. *Gregg,* 428 U.S. at

199, 96 S.Ct. 2909. The Court further stated in *Gregg* that the principles established in *Furman* applied only to limit the discretion of the *sentencing authority* "in order to minimize the risk that the death penalty would be imposed on capriciously selected group of offenders." *Id.* Therefore, I conclude petitioner's claim is meritless.

### Claims (5)

In this claim petitioner raises the following two arguments: first, that section 29–2519 and section 29–2522 fail to adequately channel the sentencer's discretion because they contain inconsistent standards for weighing aggravating and mitigating circumstances; [12] and that the use of the term "approach" in section 29–2522(2) is vague and renders the weighing process unconstitutionally arbitrary.

Because petitioner has conceded that the Nebraska Supreme Court has cured the inconsistency that he claimed existed in the statute by construction, I do not address the first part of this claim. *See* Petitioner's Brief, 67–68. With respect to petitioner's argument that the term "approach" makes section 29–2522(2) vague and the weighing process arbitrary, I disagree. It is for the Nebraska Supreme Court to interpret state law; this court may then determine only whether the proper "channeling" is achieved by that interpretation. Here, I am in accord with the Nebraska Supreme Court's conclusion that the term "approach" is not vague and can be given its plain and common meaning.[13] This is clearly in compliance with the Nebraska rule of statutory construction that states that absent anything indicating the contrary, statutory language is to be given its plain and ordinary meaning,

---

12. Section 29–2519 provides in relevant part that "the death penalty ... shall only be imposed in those instances when the aggravating circumstances existing in connection with the crime outweigh the mitigating circumstances...." NEB.REV STAT. ANN. § 29–2519 (Reissue 1995). On the other hand, section 29–2522 provides that the second consideration for the sentencer is "whether sufficient mitigating circumstances exist which

approach or exceed the weight given to the aggravating circumstances...." NEB.REV. STAT ANN. § 29–2522 (Reissue 1995).

13. The Nebraska Supreme Court concluded that the word "approach" could be given its every day meaning of "being near in quality or character." *Moore,* 250 Neb. at 831, 553 N.W.2d 120.

and when words of statute are plain, direct, and unambiguous, no interpretation is necessary or will be indulged to ascertain their meaning. *State v. Flye,* 245 Neb. 495, 506, 513 N.W.2d 526 (1994)(citing *State v. Stein,* 241 Neb. 225, 486 N.W.2d 921 (1992); *State v. Salyers,* 239 Neb. 1002, 480 N.W.2d 173 (1992)). That interpretation does not open possibilities of misapplication; it does channel application of the death penalty. Therefore, I conclude this claim is meritless.

### Claim (7)

■ Petitioner's argument in this claim is that the proportionality review as performed pursuant to section 29–2522 violated his due process and Eighth Amendment rights. I disagree. As this court concluded in petitioner's original habeas litigation, he cannot demonstrate a violation of his constitutional rights because the Supreme Court held in *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) that the Eighth Amendment does not require proportionality review in every death sentence, and rejected a similar Equal Protection challenge. *See Moore v. Clarke,* CV84–L–754 (D.Neb.), report and recommendation dated May 23, 1988 at p. 35, *adopted,* slip op. dated September 20, 1988 (Urbom, J). Therefore, I conclude this claim also lacks merit.

### Claim (8)

Petitioner's eighth claim is that 29–2523(1)(b), which states that a murder "committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of the crime" is an aggravating factor, is vague because of the use of the word "apparent" and thus fails to adequately channel the sentencer's discretion and impermissibly lowered the burden of proof required by Nebraska law and the Constitution. While he acknowledges that this court limited the meaning of "apparent" to "readily perceptible," *Holtan v. Black,* CV84–L–393, slip op. at 20, 1986 WL 12479 (D.Neb. Nov.5, 1986), and that the Nebraska Supreme Court adopted this limiting construction in *State v. Reeves,* 234 Neb. 711, 754, 453 N.W.2d 359 (1990), petitioner argues that the limiting construction was not applied in his case because the resentencing panel did not quote, paraphrase, or refer to the construction, and did not cite to *Reeves* or any other opinion adopting or applying the limiting construction.

The Supreme Court in *Godfrey* held that constitutionally narrowed constructions validly resolve vagueness problems, but that is only if these constructions are actually applied. *Godfrey,* 446 U.S. at 428–33, 100 S.Ct. 1759. The Court has also held, however, that where the sentencer is a judge, or as in this case, a panel of judges, "the federal court must presume that the judge knew and applied any existing narrowing construction." *Arave v. Creech,* 507 U.S. 463, 470, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)(citing *Walton,* 497 U.S., at 653, 110 S.Ct. 3047). Because petitioner does not offer any hard evidence to overcome this presumption, I conclude this claim is meritless.

### Claim (10)

■ Finally, petitioner claims that the sentence of death is being inflicted on him in violation of his Eighth Amendment rights because he has already been in prison more than nineteen years in isolated and segregated confinement under explicit threats of death due to delays in the court system caused through no fault of his own. I disagree.

In *Lackey v. Texas,* 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995), Justice Stevens posed the question of whether executing an inmate after he spent many years on death row can be considered cruel and unusual punishment. Addressing this question, the Eighth Circuit stated that delay in death penalty post-conviction proceedings was "a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." *Chambers v. Bowersox,* 157 F.3d 560 (8th Cir.1998). Thus, because this claim presently lacks any basis in this circuit, or any other circuit for that matter, I conclude it is meritless.

### REQUEST FOR EVIDENTIARY HEARING

Petitioner requests this court to grant an evidentiary hearing in an effort to fully develop the record. Because all petitioner's claims can be disposed of on the state record, I conclude a hearing on the merits of the claims is not necessary.

**IT THEREFORE HEREBY IS ORDERED** that petitioner's request for an evidentiary hearing is denied.

**FURTHER, IT HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that the petition for writ of habeas corpus, filing 1 be granted with respect to claims (1) and (2), and denied in all other respects.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

Sept. 18, 2000.